OPINION
Defendant-appellant, the Ohio Department of Transportation ("ODOT"), appeals from a judgment of the Ohio Court of Claims awarding plaintiff-appellee, Complete General Construction Company ("Complete General"), $374,231.08 in its action for breach of contract. Complete General cross-appeals from the judgment.
This action arises out of the construction of I-670 in Columbus, Ohio from the Convention Center to the airport. Construction of this portion of I-670 was broken into five sections, with each section being bid as a separate contract. In 1991, ODOT accepted bids for each of the five sections of the I-670 project. Complete General won four of the five contracts, including Contract 56, which is the focus of the instant action.
Contract 56 provided for the construction of a section of I-670 extending in an easterly direction from the Convention Center to a point just east of I-71. Contract 56 included the erection of three new bridges: the Third Street bridge, which provides access from I-670 to southbound Third Street; the Fourth Street bridge, which provides access from I-670 to northbound Fourth Street; and a large mainline bridge over several pairs of railroad tracks. Complete General subcontracted with the C.J. Mahan Construction Company for the erection of these three bridges.
Work on Contract 56 was scheduled to begin in March 1991. However, even before work could begin on the project, it was discovered that additional work not called for in original contract documents would be required. Specifically, a building and several underground fuel storage tanks were discovered on the job site. Shortly thereafter, ODOT issued change orders 2 and 4 granting Compete General additional compensation for the removal of the building and underground storage tanks, respectively.
Work on Contract 56 formally got under way on March 15, 1991, with project completion scheduled for August 31, 1992. However, in early June 1991, progress on the construction of the Fourth Street and mainline bridges was indefinitely delayed when it was discovered that the rebar, which had been delivered for use in these two bridges, had been improperly designed and manufactured. The bridge delay lasted almost seven months, ending sometime in late December 1991, when the correct rebar was delivered to the job site. As a result of the bridge delay, ODOT, on May 13, 1992, granted Complete General a full twelve-month work extension, bringing the job completion date to August 31, 1993. On August 17, 1993, ODOT granted Complete General an additional sixty-day extension for the removal of the building and underground storage tanks. Together, the two time extensions pushed the date for final completion of Contract 56 ahead by four hundred twenty-five days, to October 31, 1993. Complete General actually completed all of its work on Contract 56 on October 30, 1993.
Following completion of Contract 56, Complete General and ODOT entered into negotiations regarding Complete General's compensation for costs incurred as a result of the additional time beyond the original completion date which the company spent on Contract 56. On October 31, 1996, Complete General and ODOT entered into a settlement agreement, referred to as "change order 39," by which ODOT agreed to pay Complete General $177,662.47, as compensation for all costs incurred due to the two contract extensions, except "home office overhead, interest, extended major equipment costs, and bond costs." Negotiations regarding these unsettled issues continued.
On January 7, 1997, Complete General filed a complaint seeking to recover the unabsorbed home office overhead, idle equipment costs, extended equipment costs, and additional bond costs which it incurred due to ODOT's two extensions of Contract 56. Complete General's complaint also sought interest on all of its costs from the time of Contract 56's "substantial completion."
After Complete General filed its complaint, ODOT forwarded a settlement offer, referred to as "change order 40," to Complete General in which it offered to settle Complete General's claims for unabsorbed home office overhead, bond costs, and interest for a total of $196,410.34: $182,500 for unabsorbed overhead, $888.31 for bond costs, and $13,022.03 for interest. By a letter dated January 27, 1997, Complete General rejected change order 40, but agreed to accept the amount offered by ODOT as partial payment for the disputed claims. Accordingly, ODOT directly deposited $196,410.34 into Complete General's bank account.
On March 25, 1998, with the trial of Complete General's action scheduled to begin on April 13, 1998, ODOT filed a motion seeking leave to amend its answer to raise the defense of statute of limitations. On April 6, 1998, the trial court denied ODOT's motion for leave to amend its answer.
Beginning on April 13, 1998, Complete General's claims against ODOT were tried by the court. On November 18, 1998, the Court of Claims issued a decision and a judgment entry awarding Complete General $374,231.08. Specifically, the Court of Claims awarded Complete General $184,947 on its claim for unabsorbed home office overhead, $62,622.50 on its claim for idle equipment costs, $115,171.49 in interest on the overhead and idle equipment awards, and $11,490.09 in additional bond costs. However, the Court of Claims found for ODOT on Complete General's claim for extended equipment costs.
ODOT appeals from the decision of the Court of Claims assigning the following errors:
ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ERRED BY NOT FINDING THE CONTRACTOR'S CLAIMS WERE BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.
 ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN AWARDING DAMAGES FOR UNABSORBED HOME OFFICE OVERHEAD PURSUANT TO THE EICHLEAY FORMULA.
 ASSIGNMENT OF ERROR NO. 3
 THE TRIAL COURT ERRED IN ITS APPLICATION OF THE EICHLEAY FORMULA BY INCORRECTLY COUNTING THE NUMBER OF COMPENSABLE DAYS, BY NOT SUBTRACTING OVERHEAD INCLUDED IN CHANGE ORDER WORK, AND BY NOT DEDUCTING CERTAIN COSTS FROM THE OVERHEAD POOL.
 ASSIGNMENT OF ERROR NO. 4
 THE TRIAL COURT'S RELIANCE ON PLAINTIFF-APPELLEE'S EXPERT IN CALCULATING DAMAGES UNDER EICHLEAY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR NO. 5
 THE TRIAL COURT'S DECISION TO AWARD cg $62,622.50 IN IDLE EQUIPMENT COSTS BETWEEN MARCH 15, 1991 AND APRIL 29, 1992 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR NO. 6
 THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS CALCULATION OF THE BOND COSTS.
Complete General cross-appeals from the Court of Claims' decision and entry assigning the following errors:
 1. THE TRIAL COURT ERRED IN LIMITING PLAINTIFF'S RECOVERY OF HOME OFFICE OVERHEAD TO 365 DAYS, CONTRARY TO DEFENDANT'S JUDICIAL ADMISSIONS.
 2. THE TRIAL COURT MADE A MATHEMATICAL ERROR IN DETERMINING THE AMOUNT OF PLAINTIFF'S UNABSORBED OVERHEAD AWARD.
 3. THE TRIAL COURT MISCALCULATED THE PREJUDGMENT INTEREST AWARD TO PLAINTIFF.
 4. THE TRIAL COURT ERRED IN FAILING TO AWARD PLAINTIFF ITS ADDITIONAL COSTS FOR EXTENDED EQUIPMENT (IDLE AND EXTENDED).
In its first assignment of error, ODOT argues that the trial court should have dismissed Complete General's action for having been filed outside of the two-year statute of limitations set forth in R.C. 2743.16(A).[1]
As previously discussed, approximately three weeks prior to trial, ODOT moved for leave to amend its answer to include the defense of statute of limitations. The trial court denied ODOT's motion. Nonetheless, at trial, ODOT argued that Complete General's action was time-barred by the two-year statute of limitations set forth in R.C. 2743.16(A). In its final decision, the trial court held that ODOT had waived the statute of limitations defense by failing to raise it by motion prior to filing its answer pursuant to Civ.R. 12(B), in its original answer pursuant to Civ.R. 8(C), or by amendment pursuant to Civ.R. 15(A).
The trial court was correct in concluding that ODOT waived the statute of limitations defense when it did not raise the issue by motion, in its answer, or by amendment to its answer. State ex rel. Tubbs Jones v. Suster (1998),84 Ohio St.3d 70, 75. Accordingly, the only question before us is whether the trial court erred in denying ODOT's motion to amend its answer to include the statute of limitations defense.
A trial court's decision to grant or deny leave to amend is discretionary and will not be reversed on appeal absent a finding that the trial court abused its discretion. WilmingtonSteel Products, Inc. v. Cleveland Elec. Illum. Co. (1991),60 Ohio St.3d 120, 121-122. An abuse of discretion connotes more than an error of judgment; it implies a decision, which is without a reasonable basis and one that is clearly wrong. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
In the present case, ODOT's motion for leave to amend was made less than three weeks prior to the scheduled trial date. Further, a review of the trial transcript reveals that the Court of Claims had repeatedly admonished ODOT's counsel about its continuing failure to timely prepare its case. Given these circumstances, we cannot say that the trial court abused its discretion in denying ODOT's motion for leave to amend its answer. Accordingly, ODOT's first assignment of error is overruled.
ODOT's second assignment of error contends that the Court of Claims erred as a matter of law in utilizing the Eichleay formula to calculate Complete General's damages for its unabsorbed home office overhead.
When a contractor bids on a construction project, the bid price obviously incorporates all anticipated direct expenses, such as wages and equipment costs. West v. All State Boiler, Inc.
(C.A. Fed., 1998), 146 F.3d 1368, 1372. However, the bid price also includes a proportional share of the contractor's indirect costs. Indirect costs, of which the most notable is home office overhead, are those costs which are not directly attributable to the performance of any one contract, but which arise from the general operation of the business. Royal Elec. Constr. Co. v. TheOhio State Univ. (Dec. 21 1993), Franklin App. No. 93AP-339, unreported, rev'd on other grounds, 73 Ohio St.3d 110. When a construction project is delayed beyond the original completion date, a contractor's fixed overhead costs continue and, unless replacement work is found during the delay, the additional overhead costs remain unabsorbed. All State, at 1379-1380. However, because contractor accounting records typically do not apportion overhead costs among individual projects, calculating the overhead costs allocable to a delay on a given project is generally accomplished through the use of a mathematical formula.Id.
In the present case, the Court of Claims, relying upon the testimony of Complete General's construction damages expert, Theodore Trauner, utilized the Eichleay formula to calculate the proportional share of Complete General's home office overhead which remained unabsorbed during the Contract 56 extension. The Eichleay formula, which is named for the case in which it was first used, Appeal of Eichleay Corp. (July 29, 1960), ASBCA No. 5183, is a well known and widely accepted formula for calculating unabsorbed home office overhead. Indeed, the Eichleay formula was approved by this court in Royal Elec., and the United States Court of Appeals for the Federal Circuit held it to be the exclusive means for calculating unabsorbed office overhead in WickhamContracting Co., Inc. v. Fischer (C.A. Fed., 1994), 12 F.3d 1574,1580-1581. Specifically, the Eichleay formula uses a contractor's billing records to calculate unabsorbed home office overhead as follows:
 1. (Total Billings for the Contract at Issue (Total Billings from all Contracts During the Original Contract Period) x Total Overhead During the Original Contract Period = Overhead Allocable to the Contract
 2. Overhead Allocable to the Contract (Original Planned Length of Contract in Days = Daily Contract Overhead Rate
 3. Daily Contract Overhead Rate x Compensable Period in Days = Unabsorbed Overhead Damages. Royal Elec.; All State, at 1379.
However, as we noted in Royal Electric, "[t]he mere existence of a construction project delay does not entitle the contractor affected by such a delay to damages for unabsorbed home office overhead." Id. Rather, before a contractor impacted by a construction delay can utilize Eichleay, or any other formula, to calculate its damages for unabsorbed home office overhead, the contractor must establish that the delay caused some portion of its home office overhead to be unabsorbed. Id.
In attempting to establish the existence of unabsorbed overhead resulting for a contract delay or suspension, it is important to distinguish between two distinct contract periods: the "suspension period" and the "extension period." The "suspension period" is the time during which work on a project is actually delayed or suspended. All State, at 1374. In contrast, the "extension period" is the extra time beyond the original project deadline during which the contractor actually works to complete the project as a result of the suspension period. Id.
By showing that an "extension period" was added to the contract due to a government-caused delay during the original contract period, and that the contractor was on "standby" during the "suspension period," a contractor can establish a prima facie case for the existence of unabsorbed overhead. Id. at 1374, 1379. In order to demonstrate that it was on "standby," the contractor must show that the suspension period was of uncertain duration, and that the government could have at any time during the suspension period required the contractor to immediately return to work. Id.
In turn, the government can rebut a contractor's prima facie case for unabsorbed overhead damages with evidence (1) that the contractor actually re-allocated all of its unabsorbed overhead to replacement work, (2) that the contractor could have re-allocated all of its unabsorbed overhead to replacement work, as it was not impractical for the contractor to obtain such work, or (3) that, while it was impractical for the contractor to re-allocate its unabsorbed overhead to replacement work, the impracticality of obtaining replacement work was not due to the actions of governments. Id. at 1374-1376.
According to ODOT, the Court of Claims erred in utilizing the Eichleay formula because Complete General failed to establish that it was on "standby" during the bridge suspension period.[2]
ODOT concedes that the length of the bridge suspension period was uncertain and that Complete General could have been called back to work at any time during the suspension period. However, ODOT contends that Complete General was not on standby during the suspension period because it continued to work on and earn revenue from other parts of the contract during the suspension period. Essentially, ODOT takes the position that a contractor is not on standby for purposes of establishing a prima facie case of unabsorbed overhead damages, where work on one part of a project is suspended but the contractor continues to work on other parts of the project.
Initially, it is well established that a contractor's work on a project need not be completely suspended for the contractor to establish that it was on standby during the suspension of one part of the contractor's work on the project.Altmayer v. Johnson (1966), 79 F.3d 1129, 1134. In fact, the "[p]erformance of the contracts [at issue in the original Eichleay
case] was at no time completely suspended." Appeal of EichleayCorp. (Dec. 27, 1960), ASBCA No. 5183.
Further, ODOT's theory that a contractor does not incur unabsorbed overhead during a suspension period so long as the contractor continues to enjoy a revenue stream from other work on the project incorrectly assumes that unabsorbed overhead accrues during the suspension period. In fact, unabsorbed overhead damages accrue during the extension period. Id. at 1378-1379. The Federal Circuit discussed this issue at length in All State:
 * * * Where the government suspends work on a contract for an uncertain period in the midst of performance, the contractor's prediction about [the contract's] total duration may no longer be accurate. Once the contract performance period extends beyond the initial deadline, indirect costs continue to accrue but the contractor has neither allocated them to the newly-extended contract nor is able to begin a new contract to absorb the next portion of these continuing costs. It is thus the period of performance required of the contractor beyond the anticipated end-date for which the contractor does not receive its indirect costs, for by continuing work on the delayed contract, the contractor is unable to begin work on the next new contract to which it would have allocated indirect costs for the next period * * *. [(Emphasis added) Id. at 1379.]
Accordingly, whether Complete General was able to perform other work on Contract 56 during the suspension period is not relevant to whether the company incurred unabsorbed overhead during the extension period. The uncontroverted evidence that the bridge suspension period was of uncertain duration, that Complete General was subject to being called back to work at any time during the suspension period, and that Complete General was required to work on Contract 56 beyond the original completion date due to the bridge suspension period is sufficient to establish a prima facie case that Complete General incurred unabsorbed overhead as a result of the bridge problems.
ODOT also appears to argue that Complete General was not on standby during the bridge problems, because Complete General suffered no actual delay in the overall progress of its work during this period.
It is certainly true that a contractor who, during the suspension of one part of its work on a project, is able to rearrange the order of its work on the project so that it is able to avoid suffering any overall delay on the project cannot be said to be on standby during the suspension period. Melka Marine, Inc.v. United States (C.A. Fed., 1999), 187 F.3d 1370, 1376. However, to the extent that ODOT is arguing that Complete General was not on standby during the bridge suspension period because Complete General was able to continue its work on Contract 56 uninterrupted during the suspension period, albeit in a different order than it had originally planned, its argument comes much too late. When ODOT granted Complete General a three-hundred-sixty-five-day contract extension due to the bridge problems, ODOT admitted that Complete General's work on Contract 56 was delayed by the bridge problems, and waived the right to argue to the contrary.
ODOT further contends that the Court of Claims erred in utilizing Eichleay because the evidence showed that Complete General was able to reallocate whatever unabsorbed overhead it incurred as a result of the bridge delay to do replacement work. In support of this argument, ODOT points to evidence that Complete General successfully bid on $78 million worth of work during the pendency of Contract 56, and that the annual value of Complete General's work, as well as the company's bonding capacity, increased by $10 million during this same period.
Although ODOT's evidence clearly shows that Complete General continued its normal practice of bidding on construction jobs during the pendency of Contract 56, and that the company was successful enough during this period to expand the overall volume of its work, the evidence does not establish that ODOT "replaced" the work lost during the bridge delay for purposes offsetting unabsorbed overhead. In All State, the Federal Circuit elaborated upon what constitutes "replacement" work for purposes of rebutting a prima facie showing of entitlement to Eichleay damages. Specifically, the court held that "the government cannot rebut a prima facie showing of entitlement to recovery under Eichleay simply by showing that the contractor continued its normal operations, including continuing to bid on and perform `additional' contracts" during the suspension period. All State, at 1376.
ODOT does not dispute that the additional work to which it points does not constitute "replacement" work under the rule established in All State. Rather, ODOT contends that the AllState holding contradicts this court's prior decision in RoyalElectric, and makes rebutting a prima facie showing of entitlement to Eichleay damages virtually impossible.
In Royal Electric, this court concluded that the trial court had failed to address the issue of replacement work despite there being evidence in the record that the contractor had obtained other construction jobs during the suspension period. Accordingly, we remanded the matter stating:
 * * * To the extent [the contractor] was able to perform these other jobs during the delay period, a portion of [the contractor's] fixed overhead expenses were absorbed and its damages were mitigated.
We do not dispute ODOT's contention that the rule announced in AllState is at odds with Royal Electric. However, we now believe that All State establishes the better rule. As the court in All State stated:
 * * * [I]t would be inconsistent with the purpose behind Eichleay recovery to require a contractor to cease all normal, on-going operations during a government-caused suspension on one contract in order to guarantee its recovery of unabsorbed overhead costs. A healthy contractor may well be simultaneously engaged in multiple contracts, at different phases of performance. A government-imposed suspension during performance of one contract will not necessarily affect a contractor's ability to obtain and perform others. * * * [Id. at 1376.]
Nor do we dispute ODOT's contention that the rule announced in All State makes rebutting a prima facie showing of entitlement to Eichleay damages significantly more difficult. In fact, in announcing the rule that work obtained as part of a contractor's normal, ongoing bidding process did not constitute replacement work, the All State court noted that, under the new rule, there would be very few cases in which the government would be able to successfully rebut a prima facie showing of entitlement to Eichleay damages. Id. at 1380. Despite this heavy burden, the court stated that it was not persuaded that either the Eichleay test or the burden of production[3] should be altered, given that the ultimate responsibility for a contractor being on standby rests with the government. Id. "By fixing, at the outset of the suspension period, a future date on which the contractor will be expected to return to work, or by allowing the contractor a `remobilization' period at the end of the suspension period, * * * the government avoids keeping the contractor on standby during the suspension and thus avoids liability for unabsorbed overhead expenses in the future. Id. at 1380.
ODOT's second assignment of error is overruled.
We next address ODOT's third and fourth assignments of error, and Complete General's first assignment of error together, as several of the issues raised by these assignments of error are related.
ODOT's third assignment of error alleges that the Court of Claims miscalculated Complete General's unabsorbed overhead damages in several respects.
ODOT first contends that the Court of Claims erroneously included a five-month winter shutdown period from December 1, 1991, through April 30, 1992, in arriving at Complete General's compensable period in days for purposes of its Eichleay calculations.
Specification 108.06 of ODOT's "Construction and Material Specifications" provides, in relevant part, that:
 Delays caused by weather or seasonal conditions should be anticipated and will be considered as the basis for an extension * * * as determined by the following schedule:
* * *
 The time between December 1 and April 30 is considered winter months and no extensions will be granted for this time. * * *
At trial, both parties' witnesses agreed that ODOT interpreted Specification 108.06 to establish a winter "shutdown" period from the first of December to the thirtieth of May, during which ODOT did not expect its contractors to work. Both parties' witnesses also agreed that, because ODOT did not expect its contractors to work during the winter "shutdown" period, when a project delay extended into this period, ODOT added the balance of the winter "shutdown" period to the length of the suspension period when it calculated the time extension to be granted for the suspension period. For example, the bridge delay in the present case spanned a period of approximately seven months, from the beginning of June to the end of December 1991. Because the bridge delay extended almost a month into the winter "shutdown" period, when ODOT calculated the length of the time extension to which Complete General was entitled as a result of the delay, it added the remaining four months of the winter "shutdown" period to the seven-month suspension period, to arrive at a twelve-month extension. Based upon this fact, ODOT argues that Complete General actually incurred seven months, rather than twelve months of unabsorbed overhead due to the bridge delay.
In arguing that the five-month winter "shutdown" period should not have been counted in arriving at the number of days of unabsorbed overhead for which Complete General is entitled to compensation, ODOT mistakenly focuses on the length of the suspension period, rather than the length of the extension period. In All State, the Federal Circuit held that the "compensable period" for purposes of the Eichleay formula is based upon the length of the extension period and not the length of the suspension period. Id. at 1377-1379 (stating that "Eichleay recovery * * * is awarded for the period of time by which overall performance is extended, rather than the period of the suspension.") The All State court explained its holding by noting that "[w]here a contractor is able to meet the original contract deadline * * * despite a government-caused delay, [the contractor incurs no unabsorbed overhead, as] the originally bargained for time period for absorbing home office overhead through contract performance payments has not been extended." Id. at 1379. It is only where a contract is extended beyond the original deadline that a contractor will incur overhead not absorbed by the original contract payments. Id.
In the present case, the evidence established that ODOT granted Complete General a three-hundred-sixty-five-day extension as a result of the bridge delay, and that Complete General utilized all three hundred sixty-five days of the extension. Complete General's Chief Executive Officer, Lee Guzzo, testified that, when Complete General prepared its revised schedule following the bridge delay, it planned to work during the 1992-93 winter "shutdown" period, and that the company did, in fact, work throughout the period. Accordingly, Complete General was entitled to compensation for all three hundred sixty-five days of the extension period.
ODOT next argues, in its third assignment of error, that the Court of Claims should have deducted a portion of the more than $2 million worth of change order work performed on Contract 56 from Complete General's unabsorbed overhead award. Because our determination of this issue depends in part upon our resolution of the issue raised by Complete General's first assignment of error, we will address that issue first.
Complete General's first assignment of error asserts that the trial court should have included the sixty-day extension period granted for removal of the building and storage tanks as part of the Complete General's "compensable period" for purposes of its Eichleay calculations.
During the trial, ODOT's construction damages expert, Paul Gorman, testified that it is normal practice in the construction industry for change orders compensating contractors for additional work to include a five or ten percent markup for home office overhead. Based upon this testimony, the trial court found that change orders 2 and 4, which compensated Complete General for removal of the building and underground fuel storage tanks, included an amount to compensate Complete General for a proportional share of the home office overhead it incurred as a result of the additional time it spent on Contract 56 due to the removal of the building and storage tanks. Accordingly, the trial court declined to count the sixty-day extension period as compensable days in calculating Complete General's unabsorbed overhead damages pursuant to Eichleay, as doing so would have resulted in double recovery of home office overhead for the period.
Complete General does not challenge the trial court's rationale for declining to count the sixty days as compensable days; rather, Complete General argues that ODOT admitted that the sixty days were compensable. According to Complete General, ODOT's offer to settle Complete General's home office overhead claim for $182,500 in change order 40, together with its subsequent explanation, in response to Complete General's thirteenth interrogatory, that the figure of $182,500 was calculated using a daily overhead rate of $429 per day, constitute an admission that Complete General is entitled to home office overhead for four hundred twenty-five[4] compensable days.
Change order 40 and ODOT's subsequent answer to Complete General's thirteenth interrogatory do not constitute an admission of liability for four hundred twenty-five days of home office overhead. Further, Complete General's attempt to use change order 40 to establish ODOT's liability for four hundred twenty-five days of home office overhead is prohibited by Evid.R. 408.
Evid.R. 408 provides:
 Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
Evid.R. 408 makes settlement offers, completed settlement agreements, and conduct and statements made in the course of settlement negotiations inadmissible to prove liability.Fireman's Fund Ins. Co. v. BPS Co. (1985), 23 Ohio App.3d 56, 62. Change order 40 constitutes an offer of settlement. Accordingly, change order 40 was inadmissible as evidence of ODOT's liability. The trial court properly excluded the sixty-day extension period from Complete General's compensable period.
The rationale underlying the trial court's exclusion of the sixty-day extension period from Complete General's compensable period provides the basis for ODOT's contention that the Court of Claims should have deducted a portion of the more than $2 million worth of change order work performed on Contract 56 from Complete General's unabsorbed overhead damage award.
Specifically, ODOT contends that, given the Court of Claims' finding that change orders for additional work include a percentage of markup for overhead, the court was required to deduct five percent[5] of the more than $2 million worth of change order work performed on Contract 56 from Complete General's unabsorbed overhead award. We agree.
The evidence presented at trial established that, excluding change order 40, ODOT granted forty-one change orders providing over $2 million worth of additional compensation on Contract 56. Further, except for change orders 2 and 4, none of the forty-one change orders had an extension period associated with them. Because no extension period was needed for thirty-nine of the forty-one change orders, no additional overhead was incurred in completing the work called for in these change orders. See All State, at 1379-1380. (Holding that it is "the period of performance required of the contractor beyond the anticipated end-date for which the contractor does not receive its indirect costs.") However, given the trial court's finding that overhead is built into change order payments for additional work, to the extent that the thirty-nine change orders granted Complete General compensation for additional work, they granted compensation for additional overhead which the company never incurred. Consequently, the Court of Claims' failure to deduct five percent of the value of any of the thirty-nine change orders from the amount of Complete General's unabsorbed overhead damage award as calculated pursuant to Eichleay, resulted in Complete General receiving excessive compensation for unabsorbed overhead.
Nonetheless, ODOT's contention that we should simply deduct five percent of the total value of all change orders paid on Contract 56 from Complete General's unabsorbed overhead damage award is flawed. Such an approach would result in an excessive reduction of the damage award, as the total value of all Contract 56 change orders includes payments which are not properly deductible. For example, the total value of all change orders would include the amounts paid by change orders 2, and 4, which were essentially deducted from Complete General's unabsorbed overhead damages when the Court of Claims declined to include the associated sixty-day extension period in Complete General's compensable period. The total value of all Contract 56 change orders also includes amounts, such as in change order 41, which were paid to subcontractors rather than to Complete General. To the extent that Complete General did not actually receive a payment made by a change order, it would be improper to deduct five percent of the payment from Complete General's damage award for unabsorbed overhead.
Accordingly, on remand, the Court of Claims must determine the amount by which change orders 1, 3, 5 through 39, and 41 and 42 compensated Complete General for extra work, and deduct five percent of that amount from Complete General's Eichleay damage award.
The final argument raised by ODOT's third assignment of error, and the sole argument raised in ODOT's fourth assignment of error, both assert that the Court of Claims erred in adopting the testimony of Complete General's damages expert, Trauner, rather than the testimony of its own damages expert, Gorman, with respect to calculating the amount of Complete General's unabsorbed overhead damages.
Our review of the trial transcript reveals that both parties' damages experts were properly qualified, and that both testified at length regarding Complete General's overhead damages. However, the Court of Claims found Complete General's expert to be more credible on most matters pertaining to the issue of overhead damages. ODOT's third and fourth assignments of error essentially ask this court to substitute its judgment for that of the Court of Claims with respect to the credibility of the parties' expert witnesses. This we will not do.
A trial court's determinations regarding witness credibility are entitled to great deference, as the trial court was actually able to view the witnesses. The Altman Co. v. PrimoPainting, Inc. (May 5, 1998), Franklin App. No. 97APE09-1254, unreported. Accordingly, a trial court's credibility determinations will not be disturbed absent a finding that the court abused its discretion. Barney v. Barney (Mar. 4, 1997), Franklin App. No. 96APF06-754, unreported. Here, we cannot say that the Court of Claims' decision to accept the testimony of Complete General's expert over the testimony of ODOT's expert constituted an abuse of discretion.
ODOT's third and fourth assignments of error are overruled.
ODOT's fifth assignment of error and Complete General's fourth assignment of error will be addressed together, as both challenge the trial court's treatment of Complete General's claims for heavy equipment damages.
At trial, Complete General sought to recover three types of heavy equipment damages as a result of the bridge delay: (1) the costs incurred as a result of having several pieces of heavy equipment idle on the job site during the suspension period; (2) the costs incurred as a result of having several pieces of heavy equipment idle on the job site during the extension period; and (3) the costs of owning several pieces of heavy equipment used during the extension period. The trial court awarded Complete General $62,622.50 on its claim for idle heavy equipment costs incurred during the suspension period, but denied its claims for idle heavy equipment costs incurred during the extension period and for the ownership costs of heavy equipment during the extension period.
ODOT's fifth assignment of error challenges the Court of Claims' damage award for idle equipment costs incurred during the suspension period as against the manifest weight of the evidence. Complete General's fourth assignment of error challenges the trial court's denial of its claims for idle equipment costs incurred during the extension period and for the ownership costs of heavy equipment during the extension period.
When presented with a manifest weight argument, an appellate court will not overturn a judgment that is supported by some competent, credible evidence going to all essential elements of the case. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus. Adjudging the credibility of witnesses and weighing the value of their testimony is a task best left to the trier of fact. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77.
Complete General's evidence of its equipment related damages consisted entirely of the testimony of James George, one of the company's project engineers on the Contract 56 project. George testified that, by comparing ODOT's and Complete General's daily job reports for Contract 56, he was able to determine what pieces of heavy equipment Complete General had on Contract 56 job site on any given day, and whether the equipment was actually being used on a given day.
While George's testimony is sufficient to establish that Complete General had idle heavy equipment on the job site during a portion of the suspension period, his testimony does not establish that the bridge delay was the cause of this equipment being idle. In fact, Complete General presented no evidence to establish a causal link between the bridge delay and the several pieces of heavy equipment that George testified were idle during the suspension period.
George did testify that several pieces of equipment were idle because "the bridge work was not resolved, or had been resolved late." However, when this testimony is read in context, it is apparent that George based this statement on the assumption that the bridge delay period ran through April 29, 1992, the end of the winter "shutdown" period. As previously discussed, the evidence is uncontroverted that the actual bridge delay had been fully resolved by the end of December 1991. The fact that ODOT did not require Complete General to resume work on the project until after April 29, 1992, or that ODOT granted Complete General a twelve-month extension, for what was actually a seven-month suspension, is not sufficient to make ODOT responsible as a matter of law for Complete General's equipment being idle during the period after the actual bridge delay had ended. While it is possible that the equipment was idle between March 15, and April 29, 1992, as a result of some lingering problem related to the bridge delay, the record is devoid of any evidence to establish such a causal connection.
Similarly, Complete General presented no evidence to establish a causal link between the heavy equipment costs that George testified that Complete General incurred during the extension period, and the bridge delay. George's testimony merely established that certain pieces of equipment were on the job site during the extension period. However, no evidence was presented to show that the equipment was on the job site due to the bridge delay, as opposed to some other cause such as a scheduling choice by Complete General.
Accordingly, ODOT's fifth assignment of error is sustained, and Complete General's fourth assignment of error is overruled.
ODOT's sixth assignment of error asserts that the trial court erred in calculating Complete General's bond costs at five percent rather than .5 percent of its total damages, exclusive of interest, and less the $888.31 paid to Complete General pursuant to change order 40. Complete General has conceded that the Court of Claims so erred.
ODOT's sixth assignment of error is sustained.
Similarly, Complete General's second assignment of error asserts that the trial court committed a mathematical error in the calculation of Complete General's net unabsorbed overhead award. Specifically, Complete General contends that the Court of Claims erred when it subtracted $182,500, the amount ODOT had already paid to Complete General for unabsorbed overhead pursuant to change order 40, from $374,855, the total amount of Complete General's unabsorbed overhead damages as calculated pursuant to Eichleay, and arrived at a net award of $184,957. We agree. The trial court should have arrived at a net damage award for unabsorbed overhead of $192,355.[6]
Complete General's second assignment of error is sustained.
Complete General's third assignment of error asserts that the trial court erred in its calculation of the prejudgment interest award.
Pursuant to R.C. 2743.18(A)(1), Complete General was entitled to prejudgment interest on all damages found to be due by the Court of Claims from the time that Complete General had substantially completed its work on Contract 56. Royal Elec.Constr. Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, syllabus, 117-118. R.C. 1343.03(A) provides the rate at which prejudgment interest is to be awarded as follows:
 * * * [W]hen money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum * * *. (Emphasis added.)
The Court of Claims determined that Complete General's work on Contract 56 was substantially complete on September 14, 1993. The court then awarded Complete General prejudgment on its net unabsorbed overhead award and idle equipment award from the date of substantial completion through the date of the court's judgment entry, less the interest paid pursuant to change order 40. Complete General contends that the Court of Claims' prejudgment interest award denies it a significant portion of the prejudgment interest to which it is entitled.
Complete General first argues that it is entitled to prejudgment interest on the direct costs paid to it pursuant to change order 39 from the time of substantial completion until the issuance of change order 39 on October 31, 1996.
Our reading of change order 39 leads us to conclude that the change order was intended to constitute a final settlement of all matters except home office overhead, major equipment costs, and bond costs, as well as interest on any amounts found to be owing with respect to these matters. Accordingly, Complete General is not entitled to prejudgment interest on the amounts paid pursuant to change order 39.
Complete General also contends that it is entitled to prejudgment interest on all of the unabsorbed overhead it incurred on Contract 56. Specifically, ODOT argues that it is entitled to prejudgment interest on (1) the amount of its gross unabsorbed overhead from the date of substantial completion until ODOT's partial payment of unabsorbed overhead pursuant to change order 40; and (2) the amount of its net unabsorbed overhead from the date of change order 40 until the date of the Court of Claims' judgment entry.
The amount of Complete General's gross unabsorbed overhead was the subject of a determination by the Court of Claims. Complete General is, therefore, entitled to prejudgment interest on this amount up until the execution of change order 40.
Complete General is also entitled to prejudgment interest on the Court of Claims' judgment for net unabsorbed overhead damages. However, the Court of Claims calculated interest on the net award from the date of Contract 56's substantial completion. The court should have calculated interest on the net award only from the time of the execution of change order 40. Further, in recalculating the interest on the net unabsorbed damage award, the Court of Claims should use the corrected net damage award figure arrived at in our discussion of Complete General's second assignment of error.
Complete General's third assignment of error is sustained.
Having overruled ODOT's first, second, third and fourth assignments of error and Complete General's first and fourth assignments of error, but having sustained ODOT's fifth and sixth assignments of error and Complete General's second and third assignments of error, the judgment of the Ohio Court of Claims is affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part, and caseremanded.
 ________________________________ KENNEDY, PRESIDING JUDGE
BRYANT, J., and BOWMAN, P.J., concur.
[1] R.C. 2743.16(A) provides, in relevant part, as follows: "[C]ivil actions against the state permitted by [The Court of Claims Act] * * * shall be commenced no later than two years after the date of accrual of the cause of action or within any shorter period that is applicable to similar suits between private parties.
[2] In discussing ODOT's challenges to the Court of Claims' award of unabsorbed overhead, we deal only with the suspension and extension periods resulting from the delay to the Fourth Street and mainline bridges, as the Court of Claims did not find that Complete General incurred any unabsorbed overhead as a result of the sixty-day extension period resulting from the removal of the building and the storage tanks.
[3] Although the burden shifts to the government to show that it was not impractical to obtain replacement work once a contractor has established a prima face case for Eichleay damages, "[t]he burden on the government * * * is one of production only * * *." The contractor stills bears the ultimate burden of proving that it was impractical for it to obtain replacement work. MelkaMarine, at 1376.
[4] $182,500 ($429/day = 425 days).
[5] Although the Court of Claims never adopted a percentage of markup contained in change orders for unabsorbed overhead, the court did adopt Gorman's proposition that change orders contain some percentage of markup for unabsorbed overhead. The five percent sought by ODOT, is the lowest amount of possible markup testified to by Gorman.
[6] $374,855 — $184,957 = $192,355.